UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOANN STEPHENSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:06-CV-2204-B |
| | § | |
| NOKIA INC., | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM ORDER</u>

For the reasons that follow, the Court **GRANTS in Part and DENIES in Part** Defendant Nokia Inc.'s ("Nokia") Motion for Summary Judgment (doc. 10). The Court **GRANTS** the Motion for Summary Judgment with respect to Plaintiff JoAnn Stephenson's ("Stephenson") claims for disability discrimination and intentional infliction of emotional distress. The Court **DENIES** Nokia's Motion for Summary Judgment on Stephenson's Family and Medical Leave Act claim. Finally, the Court **GRANTS** Nokia's Motion for Summary Judgment requesting that Stephenson's damages be limited for failure to mitigate.

**I. Background**

Nokia employed Stephenson from February 1999 through April 2005. (Nokia's Br. 4). Her most recent position at the company was Director of Global Benefits. (*Id.*). Vickie Pettee ("Pettee"), Nokia's Vice President of Rewards and Benefits, was Stephenson's supervisor, and Kimberly Sudderth ("Sudderth") was the Director of Human Resources. (*Id.*). Liberty Mutual Insurance Company ("Liberty Mutual"), Nokia's third-party benefits administrator, evaluates and administers employee claims for Short Term Disability ("STD") leave and Family and Medical Leave Act

("FMLA") leave. (*Id.*). Nokia is not involved in administering leave but receives weekly reports from Liberty Mutual listing the employees who have been approved for leave and for how long the leave has been approved. (*Id.*).

In January 2005, Pettee began tracking Stephenson's absences and late arrivals on a calendar. (*Id.* at 5). On January 10, 2005, Stephenson did not report for work and did not tell Pettee that she would be absent. (*Id.*). On January 11, she was late for work. (*Id.*). Pettee advised Stephenson that her absenteeism, tardiness, and non-communication placed her job at risk and that she must keep regular office hours. (*Id.*). According to Nokia, Stephenson was on time only four days during the month of January. (*Id.*). On the other days she arrived late, sometimes as late as 3:00 p.m., or did not attend work at all. (*Id.*). Stephenson was absent four days during the first week of February and did not call the office before noon. (*Id.*). Nokia claims that this absenteeism caused Stephenson to fall behind in her work and that her work product suffered. (*Id.*). On February 7, Pettee placed Stephenson on a Performance Improvement Plan. (*Id.*). On February 10, Stephenson took a three hour lunch break and missed a meeting. (*Id.* at 6). She rescheduled this meeting for the next morning but did not arrive at work until 2:00 p.m. that day and missed the rescheduled meeting. (*Id.*). On February 18, Stephenson submitted a doctor's note stating that she was undergoing medical evaluation and recommending that her work day be limited to eight hours per day. (Nokia's App. 40). During the last week of February, Stephenson missed two meetings because of tardiness. (Nokia's Br. 6). On February 24, Stephenson said that she was too ill to come to work on time. (*Id.*). Pettee told Stephenson that she sympathized but that she was required to validate any accommodation through Human Resources. (*Id.*). She also stated that she needed to abide by her attendance requirements in her Performance Improvement Plan. (*Id.*). According to Stephenson,

on February 28, her manager told her that it was Stephenson's responsibility to manage her eight hour day and no action was taken to manage her workload. (Stephenson's Br. 4).

Between February 24 and March 23, Stephenson was absent or late eleven days. (Nokia's Br. 6). She often failed to call the office to say that she would be absent and did not return phone calls and text messages relating to urgent projects at work. (Nokia's Br. 7). On March 21, Stephenson and Pettee discussed her Performance Improvement Plan. *(Id.)*. Pettee told Stephenson that she was undependable, that she had exhausted all of her sick leave for the year, and that she was not responding to work requests and communications. *(Id.)*. She also stated that anything less than full, on time attendance for the next month would be grounds for termination. *(Id.)*. On March 24 (March 23 according to Nokia), Stephenson told Sudderth that her Performance Improvement Plan attendance requirements were too rigid, reported for the first time that she had fibromyalgia, and stated that as a result of this condition she could not predict when she would be able to attend work. (Stephenson's Br. 4; Nokia's Br. 7). Stephenson expressed concern that her health problems were threatening her job and requested advice on how to manage her health problems and protect her job. (Stephenson's Br. 4). Stephenson presented her doctor's note limiting her to an eight hour work day. (Nokia's Br. 7). Sudderth stated that an eight hour work day was workable but that this doctor's note would not excuse her tardiness and absenteeism. (Nokia's Br. 7-8). Sudderth informed Stephenson that STD benefits were available, explained how to apply for them, and strongly urged that she take advantage of them. (Nokia's Br. 8; Stephenson's Br. 4-5). She also explained that FMLA leave would run concurrently with STD leave. (Nokia's Br. 8). Sudderth advised Stephenson that she was still required to comply with her Performance Improvement Plan. *(Id.)*.

On March 29 and 30, Stephenson failed to report for work and did not call the office. *(Id.)*. Late on March 30, she faxed Sudderth the same doctor's note limiting her to an eight hour work day. *(Id.)*. Sudderth sent Stephenson a letter by courier expressing concern about her absences, her missed meetings, and her failure to accomplish her tasks. (Nokia's App. 70). The letter stated that the eight hour limitation in the doctor's note was not a problem but that she continued to be absent. *(Id.)*. The letter stated that the doctor's note does not state accommodations for work. *(Id.)*. Finally, it stated, "At this time, unless we receive a doctor's not by the close of business on Friday April 1, 2005, specifying what accommodations are necessary, we will have no other choice but to consider your actions your resignation from employment." *(Id.)*. On March 31, Stephenson sent a six page handwritten fax explaining that she was researching STD, FMLA, and the ADA and that she had contacted Liberty Mutual to obtain information about the claims process. *(Id. at 72-73)*. She stated that her physical symptoms had been active in the recent months and requested flexibility and understanding. *(Id. at 73)*. She also included copies of her file notes from her most recent doctor's visit reflecting a diagnosis of fibromyalgia and recommending a MRI. *(Id. at 75-76)*. Finally she stated that she would need to take the current day, the previous day, and the next day as vacation. *(Id. at 74)*. Over the next few days, Stephenson sent faxes explaining that she was trying to arrange doctor's appointments; one fax included a note from a physician's assistant that read, "Jo Ann Stephenson is being treated for a chronic illness. Upon receipt of the appropriate forms, she will be evaluated for short term disability." (Nokia's Br. 9). This fax also provided Stephenson's account of dates of conference calls and the times she arrived and left work on some days. (Nokia's App. 87-88). She also explained that stress was making her symptoms worse and that her fibromyalgia caused

fatigue. (*Id.* at 89). On April 5, Stephenson initiated a claim for FMLA and STD leave by phone with Liberty Mutual. (Stephenson's Br. 5).

On April 5, Sudderth told Stephenson (and memorialized this in a letter) that she had until April 11, 2005 to submit complete forms requesting STD. (Nokia's Br. 9). According to Stephenson, she had several discussions with Sudderth and Pettee between April 6 and 8 regarding whether Stephenson would be allowed to apply for FMLA and STD or whether she would be terminated. (Stephenson's Br. 5). Stephenson claims that on April 8 Nokia gave her permission to apply for benefits if she submitted all of the necessary documents by April 11. (*Id.*). That same day, Stephenson received a letter (copied to Nokia) from Liberty Mutual stating that it was processing her claim and that after receiving the appropriate documents, it would notify her of the outcome. (*Id.*). On April 11, her doctor recommended that she receive twelve weeks of leave with a return to work date of June 16, 2005. (*Id.*). That same day, she submitted the required documents. (Nokia's Br. 9). That afternoon, Stephenson claims that, as requested, she left a voice mail for Sudderth stating that all of the forms had been submitted and that her doctor recommended twelve weeks of leave and requesting that Sudderth call her if she had any questions or needed more information. (Stephenson's Br. 5). Stephenson also claims that she was unaware of any other action she was required to take other than waiting for a response from Liberty Mutual. (*Id.*). Liberty Mutual retroactively approved Stephenson's STD leave from March 29, 2005 through April 11. (Nokia's Br. 9). On April 22, Nokia received notice for the first time of this approval for STD leave from March 29 through April 11. (*Id.*). That same day, according to Stephenson, she received a package in the mail from David Joiner, Human Resources Administrator who reported to Sudderth, requesting that she complete additional forms relating to her FMLA/STD leave request and return

these forms to him. (Stephenson's Br. 6). Stephenson missed work on April 12 and never returned. (Nokia's Br. 9-10). On April 25, Sudderth sent Stephenson a letter by courier informing her that she was no longer employed.[1] (Stephenson's Br. 6). That same day, Stephenson received a letter (with Nokia copied) from Liberty Mutual stating that she had been approved for twelve weeks of FMLA leave. *(Id.)*. On May 2, a courier delivered five boxes of Stephenson's personal belongings to the back of her house. *(Id.)*.

On November 1, 2006, Stephenson filed her original petition in the 95th Judicial District Court of Dallas County, Texas alleging (1) disability discrimination in violation of § 21.051 of the Texas Commission on Human Rights Act; (2) violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and (3) intentional infliction of mental distress. Nokia removed the case to this Court on December 1, 2006. On September 28, 2007, Nokia filed its Motion for Summary Judgment on all of Stephenson's claims (doc. 10). On January 11, 2008, after the Court had granted her two extensions of time, Stephenson filed her response to Nokia's motion for summary judgment (doc. 21). This response only addressed Nokia's arguments regarding

---

[1]The letter stated, "This letter concerns your employment with Nokia. As you know, following multiple conversations concerning your need to be present at work, you continued to arrive late or not at all. Further, you did not let your manager or anyone else know that you were not going to be at work. These sporadic and unexpected absences and tardiness caused you to miss important meetings and left your work incomplete. During several of our discussions, you mentioned the possibility of medical issues. Nokia's policy is to work with our employees providing everything that we can so that they continue in their positions. In February, we received a note from your doctor indicating that you could be at work for no more than 8 hours a day. In spite of this note, you continued to arrive late or not at all, and continued to neglect to let anyone know if you would be in the office or not. When we sent you a letter on March 30, 2005, indicating that we needed a doctor's note concerning what accommodations were necessary or you would be separated from employment, you filed for short term disability. Liberty Mutual approved you to be away on short term disability from March 29, 2005 through April 11, 2005. The time for your return was 2 weeks ago, and again we have not heard from you. Under the circumstances, we have no choice but to accept your resignation from employment, effective immediately. Should you have any questions at all, please do not hesitate to contact me. We thank you for your service to Nokia, and wish you all the best in your future endeavors." (Nokia's App. 91).

Stephenson's FMLA claim. Nokia filed its reply on January 28, 2008 (doc. 24). Nokia's motion, being fully briefed, is now ripe for adjudication.

## II. ANALYSIS

**A.     Summary Judgment Legal Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes about material facts will preclude the granting of summary judgment. *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)). To determine whether a

genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248.

**B. Disability Discrimination Claim**

Nokia moves for summary judgment on Stephenson's disability discrimination claim arguing that (1) she does not meet the statutory definition of disabled; (2) fibromyalgia does not qualify as a disability; (3) there is no evidence of discriminatory treatment; (4) Stephenson was terminated because of absences, tardiness, poor performance, and failure to return to work and there is no evidence of pretext; and (5) Nokia would have taken the same steps despite Stephenson's alleged disability. (Nokia's Br. 12-17). Stephenson did not respond to any of these arguments. The Court will only consider the first ground for granting summary judgment on this claim because it is dispositive.

Stephenson claims disability discrimination in violation of § 21.051 of the Texas Commission on Human Rights Act ("THCRA"). Because the THCRA is so similar to the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq.*, Texas courts rely on analogous federal precedent when interpreting the THCRA. *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 473-74 (5th Cir. 2006). To state a cause of action for disability discrimination, a plaintiff must establish the following three elements: (1) "she has a 'disability'"; (2) "she is 'qualified' for the job she seeks"; and (3) "she suffered an adverse employment decision because of her disability." *LeBlanc v. Lamar State Coll.*, 232 S.W.3d 294, 299 (Tex. App.-Beaumont 2007) (citing *Turco v. Houechst Celanese Corp.*,

101 F.3d 1090, 1092 (5th Cir. 1996); *Davis v. City of Grapevine*, 188 S.W.3d 748, 757 (Tex. App.-Fort Worth, 2006, pet denied)).

A "qualified individual" with a disability is a "person who, with or without reasonable accommodation, can perform the essential functions of his employment position." *Turco*, 101 F.3d at 1093. To avoid summary judgment, Stephenson needs to show "1) that [s]he could perform the essential functions of the job in spite of [her] disability or 2) that a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of the job." *Id.* (citations omitted).

Nokia has presented evidence that Stephenson is not a "qualified individual." Nokia quoted the following exchange that occurred during Stephenson's deposition:

> Q: Did you ever apply for unemployment after you left Nokia? A: No. Q: Why not? A: Because it's my understanding you have to be fit for work and able to seek employment, and I'm not fit for work. . . . . Q: Have you made any efforts to find work since leaving Nokia? A: No. Q: And why not? A: Because I'm not fit for work. . . . . Q: Are you wanting your job back from Nokia, as well, or just the benefits? A: Since I'm not fit for work, I don't think it's suitable for me to take my job back.

(Nokia's Br. 13 n.4).

The following exchange also occurred:

> Q: Do you feel like you could work on the days that--after you rested for the two or three days? On the other days that you're feeling better, do you feel like you could work at all any little bit? A: No. Q: Why not? A: Because I have a difficult time just doing a load of laundry. Q: Even on the good days after you've rested? A: Yes.

(Nokia's Br. 14). Based on this evidence, the Court concludes that Stephenson could not perform the essential functions of her job--with or without a reasonable accommodation. Because Nokia has presented undisputed evidence that Stephenson is not a "qualified individual" with a disability,

Nokia's Motion for Summary Judgment on Stephenson's disability discrimination claim is **GRANTED.**

## C. FMLA Claim

Nokia contends that it is entitled to summary judgment on Stephenson's FMLA claim based on the following arguments: (1) Stephenson " has no evidence of a causal connection between her FMLA leave and her termination;" (2) Stephenson "was terminated for her substantial, well-documented history of absenteeism and poor performance, and Plaintiff has no evidence of pretext;" and (3)Stephenson "would have been terminated despite her taking FMLA qualifying leave." (Nokia's Mot. for Summ. J.). Stephenson responds that she can establish causation and pretext because (1) there is a temporal proximity between Stephenson's FMLA leave and her termination and (2) Nokia's story regarding when it decided to terminate Stephenson is inconsistent.[2] (Stephenson's Br. 11-12).

To establish a prima facie case of retaliation under FMLA, Stephenson must show that (1) she engaged in protected activity; (2) her employer discharged her; and (3) there is a causal link between the protected activity and the discharge. *Richardson v. Monitronics Intern., Inc.* 434 F.3d 327, 332 (5th Cir. 2005). When there is no direct evidence of discriminatory intent, the Fifth Circuit typically applies the *McDonnell-Douglas* framework. *Id.* Under this framework, once the plaintiff "establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citation omitted).

---

[2]The Court disagrees with Stephenson's reasoning regarding inconsistency. However, as discussed below, Stephenson did present sufficient evidence of pretext to survive summary judgment.

If the employer articulates this reason, the burden shifts to the employee to "show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination." *Id.* at 332-33 (citation omitted). [3]

The Court finds that Stephenson has established a prima facie case of FMLA retaliation. It has not been disputed that Stephenson engaged in a protected activity (taking FMLA leave) and was terminated; therefore, the Court need only address the third element--a causal link. The evidence established that Stephenson was retroactively approved for leave between March 29, 2005 and April 11, 2005.[4] (Nokia's Br. 9). Nokia received notice of this approval of leave on April 22, 2005. (Nokia's Br. 9). Nokia terminated Stephenson on April 25, 2005. (Nokia's Br. 10). Stephenson argues that this temporal proximity between her protected activity and her termination establishes the causal link in her prima facie case. The Fifth Circuit has addressed the issue of temporal proximity: "[*Clark County School District v.*] *Breeden* [532 U.S. 268, 273 (2001)] makes

---

[3] *Richardson* stated that the mixed-motive framework applies in FLMA cases when the "employee concedes that discrimination was not the *sole* reason for her discharge, but argues that discrimination was *a* motivating factor in her termination." *Richardson*, 434 F.3d at 333. Stephenson has not argued for the mixed-motive framework here. *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007) (holding that plaintiff who failed to raise mixed-motive claim to the district court waived it).

[4] The Court recognizes that Nokia claims that the decision-makers were unaware of the second grant of leave (leave after April 11). However, it is undisputed that they were aware of the first grant of leave (through April 11). Therefore, the Court relies on the temporal proximity between Stephenson's first grant of leave and her termination to establish her prima facie case. The temporal proximity between the second grant of leave and the termination would not establish a prima facie case if the decision-makers were unaware of it. *See Brungart v. BellSouth Telecommunications, Inc.*, 231 f.3d 791, 799 (11th Cir. 2000) (citation omitted) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection . . . However, there is this exception: temporal proximity alone is insufficient to create a genuine issue of fact as to casual connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."). In addition, as discussed below, Stephenson has presented evidence to create a material issue of fact regarding whether the decision-makers were aware of the second grant of leave.

clear that (1) to be persuasive evidence, temporal proximity must be very close, and importantly (2) temporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation." *Strong v. Univ. HealthCare System, L.L.C.*, 482 F.3d 802, (5th Cir. 2007); *see also Dollar v. Shoney's, Inc.*, 981 F. Supp. 1417, 1420 (N.D. Ala. 1997) ("[T]emporal proximity-indeed, the congruence of those two events is sufficient to demonstrate a causal connection for the purpose of stating a *prima facie* FMLA case."); 8 Employment Coordinator § 107.65 (citations omitted) ("Temporal proximity between a plaintiff's leave and eventual discharge may constitute evidence of a causal connection needed to establish a prima facie case of FMLA retaliation, and may in itself be sufficient evidence of causation to withstand a motion for summary judgment; though it is no guarantee."). The three day time span between the decision-makers receiving notice of the first grant of leave and Stephenson's termination establishes the causal connection for a prima facie case.

Because Stephenson has established a prima facie case of FMLA retaliation, the burden shifts to Nokia to articulate a legitimate, nondiscriminatory reason for Stephenson's termination. Nokia claims that Stephenson was terminated for "excessive absences, tardiness, poor work performance and because, according to Nokia's documentation, she was supposed to return to work on April 12, 2005 and did not." (Nokia's Br. 16). For this proposition, Nokia cites declarations of Pettee and Sudderth and Stephenson's termination letter. (Nokia's Br. 16).

As Nokia has articulated a legitimate, nondiscriminatory reason for terminating Stephenson, the burden shifts back to Stephenson to show that Nokia's reason is a pretext for discrimination. Stephenson cannot meet her burden at this stage by again relying on temporal proximity. The Court in *Strong* stated, "[W]e affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation [to establish pretext]. Such a rule would unnecessarily tie the

hands of employers." *Strong*, 482 F.3d at 808; *see also Dollar*, 981 F. Supp. at 1420 (quoting *Dillon v. Carlton*, 977 F. Supp. 1155, 1160 (M.D. Fla. 1997) (other citations omitted) ("'Timing . . ., standing alone, is insufficient to raise an inference of *pretext*.'"). Instead of focusing on temporal proximity, "[t]he pretext inquiry focuses on the authenticity of the employer's proffered reason. . . A 'plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.' . . . A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 248 (2000) and citing *Read v. BT Alex Brown Inc.*, 72 Fed. Appx. 112, 120 (5th Cir. 2003)).

In *Jones*, the employer fired Jones two days after he was recertified for FMLA leave. *Jones v. Continental Airlines, Inc.*, 2005 WL 2233619, at *1 (S.D. Tex. 2005). The employer claimed that the reason for firing him was that he was dishonest during interviews. *Id.* The Court stated that to establish pretext, the employee was required to disprove the employer's good faith belief in Jones' dishonesty. *Id.* at *4.[5] Because Jones did not introduce any evidence on that point, the Court granted summary judgment in favor of the employer. *Id.*

---

[5]The Court notes that in *Jones* the Court stated that "Where, as here, plaintiff has been on FMLA leave for a significant amount of time, his superior's knowledge of that fact does not raise the specter of retaliation." *Jones*, 2005 WL 2233619, at *3. In that case, the employee had been approved for FMLA in 1996 and was terminated in 2004. *Id.* The Court stated that "it stretches the imagination to believe" that the employer would wait that long to retaliate for taking FMLA leave and refused to infer causation for a prima facie case based on the fact that his supervisor knew he was on FMLA leave. *Id.* In this case, Stephenson established a prima facie case when there was only a three day gap between the notice of FMLA leave and the termination.

Similar to *Jones*, here the employer claims that it fired Stephenson, not because of her taking FMLA leave, but based on its belief that Stephenson was no longer on FMLA leave and still did not return to work. As in *Jones*, Stephenson is required to introduce evidence to disprove the decision-makers' good faith belief that Stephenson was no longer on leave. Stephenson has submitted evidence through her declaration that raises a question of whether the decision-makers held a good faith belief that Stephenson's FMLA leave expired on April 11. Stephenson stated that on April 11, she left a voice mail message for Kimberly Sudderth stating that she had submitted all of her forms and that her doctor recommended that she take twelve weeks of leave. (Stephenson's Dec. 2). She also claimed that on April 22, 2005, she received a package from David Joiner (HR Administrator and direct report to Sudderth) requesting that she complete additional forms related to her request for FMLA/STD leave. (*Id.* at 3). In its Reply, Nokia did not attempt to negate this evidence.[6] Based on the voice mail, a reasonable trier of fact could conclude that Sudderth knew that it was likely that Stephenson had been approved or was seeking approval for twelve weeks of leave. In addition, it seems inconsistent that the Nokia Human Resources Department would send her a request for forms when it was not aware that she had requested or was being considered for

---

[6]The Court notes that Nokia stated that Stephenson "provided a declaration that is speculative, incompetent, full of hearsay, and contradicts her deposition testimony." (Nokia's Reply 1). To the extent that this statement can be considered a motion to strike evidence, it is **DENIED** because it is vague and lacks specificity. *Brockie v. Ameripath, Inc.*, 2007 WL 1187984, at *6 (N.D. Tex. 2007) ("FED.R.EVID. 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken. See *United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004). Objections lacking specificity do not satisfy the requirements of Rule 103. United States v. Polasek, 162 F.3d 878, 883 (5th Cir. 1998). 'A loosely formulated and imprecise objection will not preserve error. Rather, a trial court judge must be fully apprised of the grounds of an objection.' *Id.* (citations omitted). Ameripath's objection in its motion to strike does not meet the specificity requirement of Rule 103(a)(1). Though Ameripath makes a vague objection to Petty's declaration on that ground that it is based on hearsay, the defendant fails to identify the portion of the affidavit it seeks to have excluded under such an objection.").

extended leave. The Court concludes that based on this evidence, a reasonable trier of fact could conclude that Nokia's purported reason for firing Stephenson--her failure to return to work after her FMLA leave had ended--was pretextual because they were in fact aware that her FMLA leave had not ended. A reasonable trier of fact could also find that she was terminated for her failure to return to work while on FMLA leave. Accordingly, Stephenson's FMLA claim survives summary judgment. The Court **DENIES** Nokia's Motion for Summary Judgment on Stephenson's FMLA claim. The Court now turns to Stephenson's claim for Intentional Infliction of Emotional Distress.

## D. Intentional Infliction of Emotional Distress Claim

Nokia contends that Stephenson's Intentional Infliction of Emotional Distress ("IIED") claim fails because it is based on the same facts as her TCHRA and FMLA claims.[7] (Nokia's Br. 23-24). Stephenson did not respond to this argument.

Intentional infliction of emotional distress is a gap-filler tort, "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffman-La Rocha Inc. v. Zeltwanger*, 144 S.W. 3d 438, 447 (Tex. 2004) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)). A plaintiff's inability to establish a harassment claim does not mean that the plaintiff has a claim for IIED. *Id.* at 448 ("If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim.").

---

[7]Nokia also argues that the merits of Stephenson's claim do not come close to IIED. (Nokia's Br. 24). The Court need not address this argument because it finds summary judgment appropriate on Nokia's first ground.

*Gonnering* involved claims under the ADA, the TCHRA, IIED, and other torts. *Gonnering v. Blue Cross and Blue Shield of Tex.*, 420 F. Supp. 2d 660, 663 (W.D. Tex. 2006). Applying *Hoffman-La Rocha*, the Court granted summary judgment on the IIED claim because it was based on the same facts as the ADA claim. *Id.* at 665. The court also granted summary judgment on the plaintiff's ADA and TCHRA claims. *Id.* at 669.

In her petition, Stephenson cites the same facts for her IIED claim as she did for her disability discrimination and FMLA claims. The gravamen of her IIED claim is violations of the TCHRA and FMLA; therefore, she cannot maintain an IIED claim regardless of whether she can succeed on her other claims. *Hoffman-LaRocha*, 144 S.W. 3d at 448. Accordingly, Nokia's Motion for Summary Judgment on Stephenson's IIED claim is **GRANTED.**

E.   Mitigation of Damages

Nokia moves for summary judgment limiting Stephenson's damages because she has not made any attempt to mitigate her damages by seeking other employment. (Nokia's Br. 25). Title VII claimants have a statutory duty to mitigate their damages, and this duty has been extended to FMLA claimants. *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990); *Morgan v. Neiman-Marcus Group*, 2005 WL 3500314, at *9 n.10 (N.D. Tex. 2005). Nokia has the burden of proving Stephenson's failure to mitigate. *Sellers*, 902 F.2d at 1193. Nokia can meet this burden by demonstrating (1) that substantially equivalent work was available and (2) that the plaintiff did not exercise reasonable diligence to obtain this work. *Id.* (citation omitted). In addition, "if an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." *Id.* (citation omitted).

In this case, Nokia has proven that Stephenson made no effort to obtain work. During her deposition, Stephenson was asked, "Have you made any efforts to find work since you left Nokia?" (Nokia's App. 2). Her response was "No." (*Id.*). In her response to Nokia's motion for summary judgment, Stephenson has not responded to the argument regarding mitigation of damages.[8] Accordingly there is no genuine issue of material fact regarding whether Stephenson satisfied her duty to mitigate damages. The Court **GRANTS** Nokia's Motion for Summary Judgment regarding failure to mitigate. Accordingly, Stephenson will not be entitled to backpay for the period of time that she failed to mitigate her damages.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Nokia's Motion for Summary Judgment with respect to (1) Stephenson's disability discrimination claim; (2) her intentional infliction of emotional

---

[8]While Stephenson has not argued that she could not mitigate her damages because her fibromyalgia made her unable to work, the Court briefly addresses this argument out of an abundance of caution and finds that it would not change the result. "As a general rule, a claimant will not be allowed pay during any periods of disability." *Mason v. Assoc. for Indep. Growth*, 817 F. Supp. 550, 554 (E.D. Pa. 1993) (citations omitted). *Loubrido* addressed how the failure to mitigate relates to a disabled plaintiff's inability to work: "Undoubtedly, plaintiff could not be expected to mitigate damages by searching for a job which he could not perform because of his disability. Therefore, if the period during which plaintiff was disabled under the Social Security Act is to be excluded [from the damages award], the grounds for this cannot be that he failed to mitigate damages. Nevertheless, the same reasons for excluding the time period during which he was disabled because of the accident at his second job also exist for excluding the time he was disabled under the Social Security Act because under such circumstances he could not have worked for the defendant or for anybody else. This period [of disability] is, therefore, excluded in computing the back pay period." *Loubrido v. Hull Dobbs Co. of Puerto Rico*, 526 F. Supp. 1055, 1061 (D. Puerto Rico 1981); *see also Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (citations omitted) ("Saulpaugh is only entitled to losses suffered 'as a result' of defendants' discrimination...Because Saulpaugh would not have been entitled to her salary from the Hospital while disabled, her losses after 1988 were not the result of the discrimination that she suffered."). As in these cases, Stephenson would not have been able to earn wages from Nokia or any other employer if, as she claims, her fibromyalgia made her unfit to work. This inability to work was not a result of Nokia's alleged retaliation. The Court concludes that whether analyzed under a theory of failure to mitigate or a theory of inability to recover backpay during periods of disability, the result is the same---Stephenson cannot recover backpay for the time period after her termination.

distress claim; and (3)her limitation of damages based on failure to mitigate. The Court **DENIES** the Motion for Summary Judgment on Stephenson's FMLA claim.

SO ORDERED

SIGNED May 1, 2008

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE